**UNITED STATES DISTRICT COURT**
**DISTRICT OF MAINE**

Navindra Seeram

        Plaintiff,

  v.                           **Case No.**

University of New England

        Defendant.

**Complaint and Demand for Jury Trial**

Navindra Seeram, by and through undersigned counsel, hereby complains against Defendant University of New England as follows.

**Parties**

1. Plaintiff, Navindra Seeram ("Dr. Seeram"), is an individual residing in the State of Rhode Island and is a citizen of that State.

2. Defendant, University of New England ("UNE"), is a private university with its principal place of business in Biddeford, Maine.

3. The University of New England's Westbrook College of Health Professions encompasses the School of Pharmacy.

4. UNE employs 501 or more employees.

**Jurisdiction and Venue**

5. Venue is proper in this Court because the practices alleged herein occurred in Cumberland County, State of Maine.

6. The amount in controversy exceeds $75,000.

1

7. This Court has diversity jurisdiction over this matter pursuant to 28 U.S.C. § 1332.

8. This Court also has federal question subject matter jurisdiction over Plaintiff's federal claims pursuant to 28 U.S.C. § 1331, and supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367.

**Facts**

9. In November 2024, after a competitive nationwide search, UNE offered Dr. Seeram the position of Dean of the School of Pharmacy. The position entailed both an administrative component as Dean and an academic component as a professor.

10. Dr. Seeram's offer letter specified that he would be hired at the rank of professor with tenure, pending approval of the UNE Board of Trustees at its Spring 2025 meeting.

11. Dr. Seeram accepted the position, leaving a tenured position with another university, and relocated to Maine.

12. Dr. Seeram began employment with UNE on January 2, 2025.

13. UNE and Dr. Seeram entered an employment contract upon his commencement of employment, which included an initial term of employment of five months.

14. The contract stated that the administrative role as Dean was terminable at will; however, no such language existed for his academic appointment.

15. Shortly after beginning employment, Dr. Seeram suffered a nearly fatal sepsis infection, resulting in hospitalization at Maine Medical Center from approximately January 18–31, 2025.

16.     Several of Dr. Seeram's organs (including his heart, liver, and kidney) were in failure, and he required surgeries on his left knee and wrist.

17.     Upon discharge from Maine Medical Center, Dr. Seeram continued to require home care for an additional six to eight weeks, including daily antibiotics given by IV, weekly physical therapy and occupational therapy, and visits with home nurses and therapists.

18.     During this time, Dr. Seeram lost nearly 20 pounds, could not climb stairs, and had difficulty feeding himself. He slowly progressed from a wheelchair to a walker, and then to crutches.

19.     Sepsis is known for having a high mortality rate, and patients who recover from sepsis sometimes develop post-sepsis syndrome.

20.     Post-sepsis syndrome can cause a wide range of symptoms, such as fatigue, muscle weakness, cognition problems, anxiety, depression, sleep disturbances, pain, kidney problems, heart problems, and lung problems.

21.     UNE was provided with a letter from Dr. Seeram's primary care provider dated February 18, 2025. The letter indicates, in pertinent part:

> [Dr. Seeram] was admitted to Maine Medical Center from 1/18/2025 - 1/31/2025 for a constellation of medical issues involving a severe bacterial infection of his bloodstream, infection of multiple joints requiring two surgeries, infection of his spine and inflammation of his heart.
>
> He continues to require intravenous antibiotics daily to treat the infection, as well as an intensive rehabilitation program including physical and occupational therapy to help with recovery from his surgeries. His mobility and stamina remain significantly compromised during this recovery period. Therefore, it is not currently safe for him to return to work. He is having regular medical visits with myself and multiple specialists to monitor his progress. We will update you when his condition improves enough to allow him to safely return to work.

22.     UNE was provided with a letter from Dr. Seeram's primary care provider dated March 11, 2025, which indicated that Dr. Seeram was ready to return on a part-time basis, and "will need to be allowed a modified schedule and breaks as needed during this transition time. He will also need handicap-accessible parking."

23.     UNE was also provided with another letter from Dr. Seeram's primary care provider dated March 11, 2025. This letter provided, "[t]his letter is to relay my concerns regarding the impact of undue stress on [Dr. Seeram's] illness recovery. He has been through some major health issues recently. In light of this, it is my medical opinion that any level of added stress may hinder his recovery process."

24.     Dr. Seeram returned to work on March 17, 2025.

25.     Despite being designated for part-time work with a modified schedule and being recommended to avoid undue or added stress, UNE imposed a high volume of tasks on Dr. Seeram and expected him to perform as if he had no limitations.

26.     Dr. Seeram was tasked with conducting and completing annual reviews of two department chairs and the office administrator and reading and approving all annual reviews by the two department chairs for each individual faculty member (a total of around nine faculty) by a March 31 deadline.

27.     One of the chairs was late with his reviews, requiring Dr. Seeram to work on the weekend and requiring HR to reopen some of the cases.

28.     Dr. Seeram brought the issue to the attention of John Vitale, Dean of the Westbrook College of Health Professions. Dean Vitale told Dr. Seeram that he was "now back at work," and added that Dr. Seeram must also complete the evaluations for two department chairs

4

and an office administrator—despite Dr. Seeram having no prior knowledge of or experience with their performance.

29.     Dr. Seeram was also tasked with numerous other time-sensitive matters immediately upon his return, including (i) completing the ACPE request for financial information due by April 1, 2025, as part of the UNE School of Pharmacy (SOP)'s accreditation process; (ii) contacting Husson University pharmacy students to encourage them to attend UNE; (iii) ensuring there was a "teach-out" plan for incoming Husson students, requiring meetings with UNE SOP faculty to develop a summer curriculum and attending committee meetings; (iv) attending weekly Westbrook College of Health Professions (WCHP) director meetings in person with all WCHP health program directors in a separate building from the one in which his office was located; (v) leading the conversion of the SOP from a four-year to a six-year (0–6) program, requiring multiple meetings with faculty and administrators; (vi) creating new catalog language for all pharmacy and pre-pharmacy courses, including changing course numbering, which is not a typical task for a dean, especially one who is new to the SOP; and (vii) accreditation and strategic-planning discussions with faculty.

30.     The process of recruiting students from Husson began when Dr. Seeram was still on leave. Husson was closing its pharmacy program, and UNE was seeking to entice students from that program to attend UNE.

31.     Dean Vitale wanted Dr. Seeram to take over as the point person immediately upon his return to work, with the prior point of contact at Husson being the Associate Dean at Husson University College of Pharmacy.

32.     At that point, the primary method of contact with the students was via email.

33. Dr. Seeram worked with the Associate Dean at Husson to set up a Zoom meeting with Husson pharmacy students.

34. This meeting was successful and well attended. However, there were some students who declined to select UNE or remained uncommitted for a variety of reasons.

35. Dean Vitale talked to Dr. Seeram about how each student would bring in a large amount of tuition dollars and demanded that Dr. Seeram reach out to students on their cell phones via text message.

36. Dean Vitale further instructed Dr. Seeram to obtain the students' numbers from the Associate Dean at Husson University College of Pharmacy.

37. Dean Vitale's directives and communications regarding the Husson students often occurred on weekends or off-hours.

38. Dr. Seeram reported to Dean Vitale that using his own personal device to contact Husson students, as directed, could possibly violate the Family Educational Rights and Privacy Act (FERPA).

39. Dr. Seeram initially resisted on the basis of potential FERPA violations, but ultimately complied under pressure from Dean Vitale.

40. In early 2025, the UNE SOP was undergoing a re-accreditation process with the Accreditation Council for Pharmacy Education (ACPE).

41. When hired, Dr. Seeram was assured by Dean Vitale, "I want to make sure you know that you would not be alone doing accreditation. As I shared at lunch, I have a lot of experience with accreditation and I'm happy to rollup my sleeves and work with you on this. We also have other people with experience who you can collaborate with."

42.    Unfortunately, Dr. Seeram received minimal to no assistance with the accreditation process.

43.    While preparing for the reaccreditation, Dr. Seeram reported to Dean Vitale that approximately $177,000 of grant funds were used to pay the salary of the SOP Interim Dean preceding Dr. Seeram, who was not associated with those grants.

44.    Dr. Seeram observed that the salary for the Interim Dean should come from the UNE/WCHP overall administrative budget and not from highly competitive research-generated grant funds. Dr. Seeram stated that it was highly inappropriate, borderline illegal, and could come up in the upcoming ACPE accreditation.

45.    Federal research grant funding through the National Institute of Health (NIH), including the use of grant funds for direct costs versus indirect costs, is regulated by the Department of Health and Human Services.

46.    "Direct costs" consist of expenses directly supporting or benefiting an individual research project, whereas "indirect costs" represent expenses that are not attributable to a specific research project.

47.    UNE receives research grants from the NIH.

48.    Dean Vitale responded to Dr. Seeram that the Provost and President had made the decision to use funds generated from research grants to pay the salary of the previous Dean, and not to question their decision.

49.    Without prior notice of warning, Dr. Seeram was fired on April 24, 2025—about one month after his return to work and shortly after raising the concerns alleged herein.

7

50.     The termination letter asserts that "you have engaged in serious unprofessional misconduct and seriously failed to fulfill your obligations and duties to UNE," qualifies that "[t]his letter does not, and is not intended to, list all of the facts and conclusions on which UNE's decision has been made[,]" and then lists seven different alleged examples.

51.     The decision to terminate Dr. Seeram's employment was made without warning or notice, and without providing Dr. Seeram the opportunity to respond to the alleged issues.

52.     In proceedings before the Maine Human Rights Commission, UNE did not produce any documents suggesting that it had investigated any of the issues alleged in the termination letter.

53.     Dr. Seeram personally reached out to President James Herbert shortly after the termination via text message seeking an opportunity to discuss the allegations and pursue reinstatement. The message also referred to Dr. Seeram's modified schedule, the documentation about avoiding stress, and requested an investigation.

54.     President Herbert read Dr. Seeram's message.

55.     President Herbert did not respond, and another employee contacted Dr. Seeram to state that the decision was final.

56.     Dr. Seeram did not engage in any professional misconduct or otherwise fail to fulfill his obligations or duties to UNE.

57.     Dr. Seeram contends that the stated reasons for his termination were pretextual intended to mask true, unlawful reasons that violate the Maine Human Rights Act, the Maine Whistleblower's Protection Act, and the Americans with Disabilities Act.

8

58.    UNE unlawfully discriminated and retaliated against Dr. Seeram with malice or reckless indifference to his rights.

59.    As a result of UNE's unlawful actions, Dr. Seeram has suffered lost wages, lost benefits, loss of enjoyment of life, injury to reputation, injury to career, humiliation, and other pecuniary and non-pecuniary losses.

60.    By prematurely terminating Dr. Seeram's employment as a professor in violation of his contract, UNE deprived Dr. Seeram of the opportunity to obtain tenure at the Spring 2025 meeting.

61.    Dr. Seeram has met the procedural prerequisites for filing his complaint, having made dual filings with the Maine Human Rights Commission and the Equal Employment Opportunity Commission, having received right-to-sue letters from both, and having commenced this action within 90-days of those letters.

### Count 1: Maine Human Rights Act
### (Unlawful Discrimination - Disability)

62.    Plaintiff repeats and realleges the allegations set forth in paragraphs 1 through 61 as if fully stated herein.

63.    Plaintiff had a disability with the meaning of the MHRA and 5 M.R.S. § 4553-A(1)(A)–(D), including having an impairment, a record of an impairment or condition, and being regarded as having or likely to develop an impairment or condition, and was a qualified individual with a disability.

64.    Defendant terminated Plaintiff's employment because of his disability, in violation of the MHRA.

## Count 2: Maine Human Rights Act
### (Unlawful Retaliation)

65.     Plaintiff repeats and realleges the allegations set forth in paragraphs 1 through 64 as if fully stated herein.

66.     Plaintiff engaged in conduct protected by the MHRA, including but not limited to taking a medical leave of absence as a reasonable accommodation under the MHRA, and requesting additional reasonable accommodations upon his return to work.

67.     Defendant violated the MHRA by retaliating against Plaintiff for his protected activities.

## Count 3: Maine Human Rights Act
### (Failure to Accommodate)

68.     Plaintiff repeats and realleges the allegations set forth in paragraphs 1 through 67 as if fully stated herein.

69.     During Plaintiff's employment and continuing until the termination of his employment, Defendant failed to provide reasonable accommodations for Plaintiff's disability in violation of the MHRA.

70.     Said failures include, but are not limited to, failing to modify the manner or circumstances under which Dr. Seeram's job was to be performed after his return to work, and terminating his employment.

## Count 4: Maine Whistleblower's Protection Act
### (Whistleblower Retaliation)

71.     Plaintiff repeats and realleges the allegations set forth in paragraphs 1 through 70 as if fully stated herein.

10

72.     Defendant violated the MHRA by retaliating against Plaintiff because he in good faith reported circumstances or directives that he had reasonable cause to believe were in violation of law and resisting directives he had reasonable cause to believe were in violation of law.

### Count 5: Americans with Disabilities Act
### (Discrimination - Disability)

73.     Plaintiff repeats and realleges the allegations set forth in paragraphs 1 through 72 as if fully stated herein.

74.     At all times relevant to this complaint, Plaintiff had a disability with the meaning of the ADA, including having an impairment, a record of an impairment, and being regarded as having or likely to develop an impairment.

75.     Defendant terminated Plaintiff's employment because of his disability, in violation of the ADA.

### Count 6: Americans with Disabilities Act
### (Retaliation)

76.     Plaintiff repeats and realleges the allegations set forth in paragraphs 1 through 75 as if fully stated herein.

77.     Plaintiff engaged in conduct protected by the ADA, including but not limited to taking a medical leave of absence as a reasonable accommodation under the ADA, and requesting additional reasonable accommodations upon his return to work.

78.     Defendant violated the ADA by retaliating against Plaintiff for his protected activities.

## Count 7: Americans with Disabilities Act
### (Failure to Accommodate)

79.     Plaintiff repeats and realleges the allegations set forth in paragraphs 1 through 78 as if fully stated herein.

80.     During Plaintiff's employment and continuing until the termination of his employment, Defendant failed to provide reasonable accommodations for Plaintiff's disability in violation of the ADA.

81.     Said failures include, but are not limited to, failing to modify the manner or circumstances under which Dr. Seeram's job was to be performed after his return to work, and terminating his employment.

82.     Defendant terminated Plaintiff's employment because of his disability, in violation of the ADA.

## Count 8: Breach of Contract

83.     Plaintiff repeats and realleges the allegations set forth in paragraphs 1 through 82 as if fully stated herein.

84.     Defendant breached its employment contract with Plaintiff by terminating his employment as professor prior to the expiration of the term of employment.

85.     By terminating Plaintiff's employment on April 24, 2025, in violation of the contract, Defendant precluded Plaintiff's tenure from being considered by the Spring 2025 Board of Trustees as contemplated in the employment contract.

## Prayer For Relief

Plaintiff requests that the Court grant the following relief:

A.     Enter judgment in Plaintiff's favor;

B.      Declare the conduct engaged in by Defendant to be in violation of his rights;

C.      Award back pay and benefits;

D.      Order Defendant to reemploy Plaintiff in his former position or, in the alternative, award Plaintiff front-pay and benefits.

E.      Award compensatory damages in an amount to be determined at trial;

F.      Award punitive damages in an amount to be determined at trial;

G.      Award nominal damages;

H.      Award attorney's fees, including legal expenses, and costs;

I.      Award prejudgment interest; and

J.      Grant to Plaintiff such further relief as the Court deems just or equitable.

**Demand for Jury Trial**

Plaintiff demands a jury trial on all claims so triable.

Dated: April 15, 2026                    /s/ Tyler J. Smith
                                          Tyler J. Smith (Bar No. 4526)
                                          *Attorney for Plaintiff*

                                          Libby O'Brien Kingsley & Champion, LLC
                                          62 Portland Road, Suite 17
                                          Kennebunk, ME 04043
                                          (207) 985-1815
                                          tsmith@lokllc.com